UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6: 09-16-S-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| WILLIAM E. STIVERS, a/k/a "AL MAN," | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

**\*\*\*\*    \*\*\*\*    \*\*\*\***

Defendant William E. "Al Man" Stivers has filed a post-trial motion for judgment of acquittal on Count 4 (attempted extortion) and Counts 12 and 13 (forfeiture) of the Superseding Indictment. [Record No. 867] Stivers argues that his attempted-extortion conviction is not supported by the evidence presented at trial. He further contends that to hold him jointly and severally liable with his co-conspirators for the entire forfeiture amount would violate the Excessive Fines Clause of the Eighth Amendment. For the reasons explained below, the Court will grant Stivers' motion with regard to Count 4 but deny the motion as to Counts 12 and 13.

## I.    BACKGROUND

This case involves extensive corruption surrounding elections in Clay County, Kentucky. Stivers and seven other defendants, including various Clay County public officials, were charged in a thirteen-count Superseding Indictment that alleged RICO and money-laundering conspiracies by all eight defendants, as well as other conspiracies and substantive offenses by

individual defendants and combinations of defendants.  [*See* Record No. 272]  In the final two counts, the United States sought forfeiture of $3,472,847.38 and $1,513,512.36 upon conviction of the conspiracies charged in Counts 1 (RICO) and 2 (money laundering), respectively.  In addition to the RICO and money-laundering conspiracies, Stivers was charged with attempted extortion, obstruction of justice, and voter-fraud and vote-buying conspiracies.  Of these, only the attempted-extortion count is at issue in the present motion.  That charge was based on a series of incidents in September 2004 during which Stivers, an election officer, and Defendant Charles Wayne Jones, the Democratic election commissioner, approached Manchester city council candidate Carmen Webb Lewis and informed her that she must pay $1,000 to ensure victory in the upcoming election.[1]  Lewis testified at trial that her understanding was that the money should be given to then-city council member Vernon Hacker, who would use it to buy votes for Lewis.  [Record No. 848, p. 74]  On multiple occasions, Lewis refused to pay.  Further, she informed Stivers and Jones that she was unconcerned about losing the race if winning required payment of $1,000.  [*Id.*, p. 11-13]  Nevertheless, Lewis won a city council seat in the November 2004 election, securing the eighth and final council position.  [*Id.*, p. 35, 69]

At the conclusion of an eight-week trial, a jury found all the defendants guilty on all charges.  Forfeiture proceedings were held before the same jury immediately following the

---

[1]     As noted below, the Court views the evidence in the light most favorable to the government. However, the facts giving rise to the attempted-extortion charge are essentially uncontested.  While Stivers argued in his previous Rule 29 motions that the United States could not establish that he was a public official at the time of the encounters with Lewis and thus he could not be convicted under the color-of-official-right theory, he appears to have abandoned that argument for purposes of the present motion.  In any event, the Court notes that Sixth Circuit law is clear that private citizens may be convicted of extortion (or attempted extortion) under color of official right in certain circumstances, such as where a private citizen aids and abets a public official's extortionate acts.  *See United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (citing *United States v. Collins*, 78 F.3d 1021, 1031-33 (6th Cir. 1996)).

verdict. During the forfeiture proceedings, the United States displayed a chart that showed the amount allegedly received by each defendant in connection with the RICO and money-laundering conspiracies and thus subject to forfeiture. This breakdown included salaries of defendants who had allegedly maintained their employment by virtue of their involvement with the RICO enterprise, as well as the value of city and county contracts awarded to companies owned by certain defendants, which represented proceeds of illegal activity as defined under the money-laundering statute. While the United States asserted that Stivers received a $75,000 settlement in a civil lawsuit against the City of Manchester as a result of his relationship with Defendant Cletus Maricle (then a circuit judge in Clay County), as well as a nominal sum for his service as an election officer, the government's chart did not attribute any of the total forfeiture amount to Stivers. The jury ultimately found $3,200,000.00 subject to forfeiture under Count 12 and $1,513,512.36 subject to forfeiture under Count 13.

Stivers previously moved for judgment of acquittal on Counts 1, 2, and 4 at the close of the government's case-in-chief and again at the close of all proof. Those motions were denied. In the present motion, Stivers again contends that the evidence does not support his conviction on Count 4, and he challenges the constitutionality of the forfeiture verdict on Counts 12 and 13.

## II.     ANALYSIS

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "'is a challenge to the sufficiency of the evidence.'" *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (quoting *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996)). When considering a Rule 29 motion, the Court must view the evidence in the light most favorable to

the prosecution, giving the government "'the benefit of all inferences which can reasonably be drawn from the evidence.'" *United States v. Carter*, 355 F.3d 920, 925 (6th Cir. 2004) (quoting *United States v. Head*, 927 F.2d 1361, 1365 (6th Cir. 1991)). Moreover, for purposes of a motion for judgment of acquittal, "'[i]t is not necessary that the evidence exclude every reasonable hypothesis except that of guilt.'" *Id.* (quoting *Head*, 927 F.2d at 1365). Rather, acquittal is required only "if 'there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Davis*, 981 F.2d 906, 908 (6th Cir. 1992) (quoting *United States v. Fawaz*, 881 F.2d 259, 261 (6th Cir. 1989)). Despite this relatively forgiving standard, upon review of the record the Court finds that there is insufficient evidence to support Stivers' conviction of attempted extortion under Count 4. However, his constitutional argument with respect to forfeiture under Counts 12 and 13 fails.

### A.    Attempted Extortion

Stivers was charged with attempted extortion under the Hobbs Act, 18 U.S.C. § 1951. The statute provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce, by . . . extortion or attempts or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). "Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The term "fear" includes fear of economic loss. *Collins*, 78 F.3d at 1030.

In this case, the United States charged attempted extortion under two theories. First, it contended that Stivers attempted to obtain money from Carmen Webb Lewis by the wrongful

use of fear of economic loss.  Second, it asserted that Stivers attempted to obtain money from Lewis under color of official right.  Stivers argues that the evidence presented at trial does not support his conviction under either theory.

### 1.    Fear of Economic Loss

To prove attempted extortion under a fear-of-economic-loss theory, the government must establish that the defendant attempted to obtain property from the victim by wrongfully causing her to fear economic loss — or, if the victim already had such a fear, by exploiting it.  *See* 18 U.S.C. § 1951(b)(2); *United States v. Williams*, 952 F.2d 1504, 1513-14 (6th Cir. 1991) (in extortion case under § 1951, defendant need not have caused victim's fear; exploitation of existing fear is sufficient); *United States v. Goodoak*, 836 F.2d 708, 712 (1st Cir. 1988) (while in extortion cases the government must prove that the victim was actually afraid, in an attempted-extortion case, "it is sufficient merely to show an attempt to generate fear in the victim" (citing cases from the Second, Fifth, Eighth, and Ninth Circuits)).  The defendant need not have threatened the victim in any way.  *Williams*, 952 F.2d at 1513.  However, the alleged fear must be reasonable.  *United States v. Mitov*, 460 F.3d 901, 907 (7th Cir. 2006).  Thus, in the instant case, the United States was required to show that Stivers attempted to make Lewis fear she would suffer economic loss if she did not pay as instructed — or that he intended to exploit such a fear — and that the fear would have been reasonable.

Stivers contends that, at most, the evidence adduced at trial shows that he attempted to exploit Lewis' fear that she would be unsuccessful in the city council race.  [Record No. 867-1, p. 7]  He maintains that losing the election would have been a non-economic harm that cannot

support a conviction under the fear-of-economic-loss theory. [*Id.*] The United States responds by arguing, for the first time, that Lewis feared that the money she had spent on her campaign would be wasted if she did not pay as Stivers directed. [Record No. 908, p. 8] According to the United States, "Lewis clearly was reasonable in her fear that if she did not pay as directed by Stivers and Jones she would not be elected and all monies used in her campaign for city council would be spent in vain." [Record No. 908, p. 8] The government further notes that "[t]he evidence was replete with examples where Clay County candidates were fleeced for contributions by these defendants" and asserts that, "anyone trying to get elected in Manchester would be reasonable in believing that money spent to get elected would be in vain unless those in power and influence inside the Board of Elections were compensated."[2] [*Id.*] However, the United States does not point to any evidence that Lewis had such a fear. In fact, a review of her testimony reveals none.

While the victim's state of mind is not an essential element of the offense in attempted-extortion cases, evidence regarding the victim's reaction to the alleged extortion attempt is relevant to show whether the defendant possessed the requisite intent. *Goodoak*, 836 F.2d at 712. Here, the evidence not only failed to show that Lewis feared economic loss if she did not win the election, it actually established the contrary: Lewis testified unequivocally that the prospect of losing the city council race did not worry her. [Record No. 848, p. 13] She described her repeated refusals to pay and recalled that the second time Stivers and Jones

---

2       The government's suggestion that Lewis would have been reasonable to fear that her campaign expenditures would be for naught if election officials were not "compensated" is without support, since, as will be discussed more fully in the next section, there was no evidence that the money sought from Lewis was to be used for anything other than vote-buying.

approached her and told her that she could not win a city council seat if she did not pay $1,000, she "pretty much just said, 'Listen, that's okay, I just won't win. I'll just take the chances, I'm not worried about that, I'm not winning. If I don't pay, I'm not worried about it.'" [*Id.*] Lewis never testified that she was afraid of what would happen if she did not pay the money Stivers told her was required, and there is no evidence suggesting that she was concerned about losing whatever money she had invested in her campaign. Moreover, she did not mention that she had spent any money on the race at all. Instead, she indicated that she would not have paid a significant amount to secure her election. Lewis testified that she told Stivers she was "not giving a thousand dollars for anything, let alone a city council race."[3] [*Id.*, p. 9]

Nor is there evidence that other candidates lost money in this way or feared that they might.[4] Although the United States contends that Ray "Chipman" Adams was also a victim of extortion attempts by Stivers [*id.*, p. 1] during his unsuccessful race for magistrate in 2002, Adams' brief testimony contains no suggestion that Stivers intended to make him fear that he would lose whatever money he had spent on the race if he did not cooperate:

> Q    If you could, tell us about that meeting that you had with Mr. Stivers prior
>      to the election day in 2002.

---

[3]    Although the United States was not required to prove that Lewis actually feared economic loss for purposes of the attempted-extortion charge, the Court notes that the government's after-the-fact argument as to her supposed fear makes little sense from a mathematical standpoint, given the evidence presented at trial. If, as Lewis testified, she was unwilling to spend $1,000 on the city council race, then she would have had less than $1,000 to lose by not paying the money Stivers told her was required — in other words, if she had lost the race without paying, she would have been in a better position economically than had she given the $1,000 to Hacker and won.

[4]    It is debatable whether fearing the loss of campaign funds would be reasonable in any event, since even in a legitimate election there are winners and losers, the latter of whom could be said to have "wasted" whatever money they spent on the race.

| | |
|---|---|
| A | [Stivers] and another fella came to my house and they wanted to put me on the ticket to run, you know, for magistrate and he asked me for $6,000. |
| | . . . . |
| Q | And what did you tell them? |
| A | I told them no, I didn't want to win it that way and I didn't have the money to do [any]thing like that [any]way. |
| Q | Now, they referred to putting you on a ticket. Did you know what they meant by that? |
| A | No. |
| Q | Okay. Did you ask them to explain it to you any more? |
| A | No. |
| Q | Did you get approached any more by Mr. Stivers before that election in 2002? |
| A | Yes, he c[a]me back a week or maybe two weeks after that and r[a]ng the doorbell, and I went to the door and he asked me had I changed my mind and I said no and he left. |

[Record No. 850, p. 6-8] On cross-examination by Stivers' counsel, Adams acknowledged that

he was not sure exactly what Stivers meant by the request but that he knew he did not have the

$6,000 Stivers sought. [*Id.*, p. 10] He did not mention having spent any money on the race or

being afraid he would suffer economic harm if he did not come up with the $6,000. Adams'

testimony thus lends no support to the government's position.

In short, nothing in the record tends to show that Stivers' intent was to make Lewis pay

$1,000 out of a reasonable fear that she would lose money she had already spent on the race.

While the jury certainly could have inferred from Lewis' testimony that Stivers attempted to

create or exploit a fear that she would lose the city council race (even if the evidence showed that he was unsuccessful in that attempt), the record contains no evidence supporting a reasonable inference that Stivers tried to instill or exploit a fear of *economic* loss if Lewis did not pay the $1,000 he told her was necessary in order to win.  The government's argument that Lewis might have feared the loss of money she had already spent on the race is simply too attenuated, as there is no evidence that she had even made any such expenditures, that other candidates had experienced or feared similar losses, or any other evidence that Stivers intended to prey on a fear of such monies going to waste.  Moreover, the record reveals no other economic loss that Lewis stood to suffer if she did not pay as directed.  Thus, the Court finds that there is insufficient evidence to support Stivers' conviction of attempted extortion under the government's fear-of-economic-loss theory.

### 2.      Color of Official Right

The United States also alleged that Stivers and Jones attempted to obtain money from Carmen Webb Lewis under color of official right.  Stivers argues that his conviction under this theory is unsupportable because the evidence does not show that he, Jones, or Vernon Hacker sought the money in exchange for the taking or withholding of any official action.  [Record No. 867-1, p. 8]  The Court agrees with Stiver's contention on this point.

The Supreme Court has held that, to convict a defendant of extortion under color of official right, the United States must establish "that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for *official acts*." *Evans v. United States*, 504 U.S. 255, 268 (1992) (emphasis added).  The government need not

prove an "explicit, direct link" between the payment received by the public official and "a promise to perform a particular, identifiable act," nor is it required that the official have intended to actually take the agreed-upon action. *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009). However, the payment must be part of an agreement that the recipient will "improperly exert his *official influence* on the payor's behalf." *Id.* at 519 (emphasis added). There is no evidence of such an agreement, or an attempt to create one, in this case.

The United States asserts that "Defendants Jones and Stivers made clear that Lewis 'must pay to win' and implied that she would need their influence in acting or not acting in their official capacities to win her office." [Record No. 908, p. 6] In support of this assertion, the government simply notes that Jones was a member of the Clay County Board of Elections, which was responsible for certifying election results, and that Stivers was an election officer. [*Id.*, p. 5-6] However, while Lewis testified that at the time of her encounters with Stivers and Jones, she was aware that Stivers "handled . . . the absentee voting when you went into the machine before the election started" and Jones was "on the county Board of Elections," there is no evidence that the demand for $1,000 was related to those positions (or to Hacker's position as a city council member), nor did Lewis' testimony suggest that Stivers attempted to make her believe that he or Jones would exercise any official influence on her behalf in exchange for payment. Instead, Lewis agreed on direct examination, the "clear impression" she got from Stivers and Jones was that the money would be used to buy votes in her favor. [Record No. 848, p. 10; *see also id.*, p. 74-75]

Even if there had been evidence that Stivers improperly wielded his influence as a public official in attempting to persuade Lewis to pay, no one can seriously contend that vote-buying — a crime — would constitute an "official act" by an election officer, election commissioner, or city council member.[5]  *See id.*  The government does not point to evidence supporting a conclusion that the action that was supposed to have been taken in exchange for the $1,000 was anything other than vote-buying, and the Court can find none.  Because the record does not support a reasonable inference that Stivers attempted to obtain money from Lewis in exchange for an official act, there is insufficient evidence to sustain his conviction of attempted extortion under a color-of-official-right theory.

## B.      Forfeiture

With respect to the two forfeiture counts, Stivers does not directly challenge the sufficiency of the evidence supporting the verdict but instead argues that holding him liable for the approximately $4.7 million forfeiture total would violate the Excessive Fines Clause of the Eighth Amendment.  [Record No. 867-1, p. 6]  His argument is largely based on the absence of a dollar amount next to his name on a chart used by the United States to illustrate how it arrived at the total forfeiture amount.  Each of the other seven defendants was assigned a dollar figure that represented the sum of money he or she had allegedly received in connection with the

---

5       This might be a closer question if, for example, Stivers had attempted to give Lewis the impression that in exchange for $1,000, he would change votes in her favor or refrain from changing votes in favor of her competitors — *i.e.*, that he would take some action *as an election officer* in return for the money.  While such actions still would not have been official acts, they at least would have been more directly related to his position than vote-buying, which does not require access to a public office.

conspiracies charged in Counts 1 and 2.[6]  Stivers maintains that because the United States did not allege or prove that he received any money as a result of his participation in the conspiracies, the $4.7 million forfeiture constitutes an unconstitutional excessive fine as to him.

As a preliminary matter, the Court notes that a Rule 29 motion may not be the appropriate vehicle for such a challenge, as Stivers no longer contests the sufficiency of the evidence with regard to the convictions underlying the forfeiture verdict (*i.e.*, the RICO and money-laundering conspiracies), nor does he argue that there is insufficient evidence connecting the property sought to be forfeited with those underlying offenses.  Criminal forfeiture "is a part of the defendant's sentence, not part of the substantive offense of conviction."  *United States v. Corrado*, 227 F.3d 543, 558 (6th Cir. 2000) (citing *Libretti v. United States*, 516 U.S. 29, 39 (1995)).  Thus, because it relates to the punitive aspect of the requested forfeitures and not whether the forfeiture verdicts are supported by the evidence, Stivers' Eighth Amendment argument would be more properly made upon entry of final judgment of forfeiture.  In any event, however, the Court finds Stivers' constitutional challenge unpersuasive.

### 1.      Joint and Several Liability

The Sixth Circuit has unequivocally stated that "co-conspirators in a RICO enterprise should be held jointly and severally liable for the reasonably foreseeable proceeds of the enterprise, and are not limited to amounts each defendant personally 'obtained.'"  *Corrado*, 227 F.3d at 558.  In *Corrado*, the court held that it was clear error for the district court to require

---

6      These amounts ranged from $2,900.00 (Defendant Jones' compensation for service as Democratic election commissioner) to $704,736.13 (Defendant Doug Adams' total salary as superintendent of Clay County schools during the conspiracies' existence).

proof that money collected by certain conspiracy members had been shared with other co-conspirators. The court quoted with approval an Eighth Circuit holding that "'[t]he government is not required to prove the specific portion of proceeds for which each defendant is responsible.'" *Id.* at 553 (quoting *United States v. Simmons*, 154 F.3d 765, 769-70 (8th Cir. 1998)). The *Corrado* defendants were thus held jointly and severally liable in forfeiture for proceeds their co-conspirators obtained "by reason of their 'participation or involvement' in [the] enterprise," even where the evidence did not show that they had received any personal benefit from their co-conspirators' activities.[7] *Id.* at 556.

Moreover, while the Sixth Circuit has not addressed the issue in other forfeiture contexts, several circuits follow a similar rule with respect to forfeiture in non-RICO conspiracy cases, including cases involving conspiracy to commit money laundering under 18 U.S.C. § 1956. *See United States v. Pitt*, 193 F.3d 751, 765 (3d Cir. 1999) ("We interpret [18 U.S.C.] § 982(a)(1) as imposing a rule of joint and several liability in the case of a money laundering conspiracy. . . . [T]he statute recognizes that the amount of property involved in a money laundering conspiracy cannot be different for different conspirators."); *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995) ("It is largely fortuitous whether an individual co-conspirator

---

7    Stivers attempts to distinguish *Corrado*, arguing that the Sixth Circuit "has not ruled that forfeiture liability arises where the government concedes that a defendant has not gained any proceeds at all from the charged criminal activity." [Record No. 867-1, p. 6] However, that is precisely the rule set out in *Corrado*: that *all* members of a RICO conspiracy are liable for reasonably foreseeable conspiracy proceeds, regardless of whether each individual member received a share. *See* 227 F.3d at 557-58. Furthermore, in the portion of the *Corrado* decision quoted by Stivers regarding proceeds from the sale of a hotel, the Sixth Circuit declined to reverse the district court's ruling because it found "scant evidence of a connection between *the enterprise* and the sale of th[e] hotel" — in other words, there was insufficient evidence that the proceeds of the transaction were subject to forfeiture. *Id.* at 555 (emphasis added). As noted previously, Stivers does not challenge the sufficiency of the evidence connecting the funds sought in forfeiture with the underlying conspiracies.

happened to possess the laundered funds at a particular point. . . . So long as the amount handled by others is foreseeable as to a defendant, the foreseeable amount represents the sounder measure of liability."); *see also, e.g.*, *United States v. Jalaram, Inc.*, 599 F.3d 347 (4th Cir. 2010) (forfeiture under 18 U.S.C. § 2253 for conspiracy to violate the Mann Act); *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996) (forfeiture under 21 U.S.C. § 853 for conspiracy to distribute marijuana). The Court sees no reason to distinguish between the RICO and money-laundering conspiracies with respect to joint and several liability, given the well-established rule that a conspiracy member is liable for reasonably foreseeable substantive offenses committed by his co-conspirators in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946); *Hurley*, 63 F.3d at 22 (holding co-conspirators jointly and severally liable in forfeiture based on *Pinkerton* rule). Thus, the Eighth Amendment analysis here begins with the assumption that Stivers is jointly and severally liable in forfeiture for the reasonably foreseeable proceeds of the conspiracies charged in Counts 1 and 2.

### 2. Excessive Fines Clause

The Sixth Circuit acknowledged in *Corrado* that "any forfeiture award must comport with the Eighth Amendment prohibition against 'cruel and unusual punishment' or 'excessive fines.'" 227 F.3d at 558. However, because the defendants in that case did not challenge the constitutionality of the forfeiture judgment under the Excessive Fines Clause, the court did not engage in a detailed Eighth Amendment analysis but instead simply noted that it was "satisfied that there has been no Eighth Amendment violation under the circumstances of this case,

particularly in light of the seriousness of the offenses charged and the great amounts of income derived through the activities of th[e] enterprise over the years." *Id.*

The amount of forfeiture in relation to the seriousness of the underlying offense is "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998); *see also Corrado*, 227 F.3d at 552 ("Though the [RICO forfeiture] statute appears to require total forfeiture of illegal proceeds, courts can reduce the forfeiture to make it proportional to the seriousness of the offense so as not to violate the Eighth Amendment prohibition against 'cruel and unusual punishment' or 'excessive fines.'"). A forfeiture that is "grossly disproportional" to the gravity of the offense it is meant to punish violates the Eighth Amendment. *Bajakajian*, 524 U.S. at 334.

In *Bajakajian*, the Supreme Court considered several factors in determining that forfeiture of the entire amount involved in a currency-reporting violation was grossly disproportional to the offense and thus unconstitutional: (1) the nature of the offense; (2) the origin and intended use of the money; (3) whether the offense was connected to other crimes or was an isolated incident; (4) whether the defendant belonged to the class of persons targeted by the statute; (5) the maximum sentence and fine for the offense; and (6) the harm caused by the defendant's actions. *Id.* at 337-39; *see also United States v. Ely*, 468 F.3d 399, 402-03 (6th Cir. 2006) (analyzing forfeiture under *Bajakajian* factors). Because Bajakajian's crime "was solely a reporting offense" that was "unrelated to any other illegal activities"; the currency "was the proceeds of legal activity and was to be used to repay a lawful debt"; Bajakajian "d[id] not fit into the class of persons for whom the statute was principally designed"; the maximum sentence

for the offense was six months' imprisonment and the maximum fine was $5,000; and the harm caused by the crime was "minimal," the Supreme Court concluded that Bajakajian's crime was not serious enough to justify forfeiture of the entire $357,144 involved in the reporting offense. *Bajakajian*, 524 U.S. at 337-40.

The Sixth Circuit has applied the *Bajakajian* factors in forfeiture cases, but — other than the perfunctory finding in *Corrado* mentioned above — does not appear to have addressed the issue of excessive fines in the context of joint and several liability among co-conspirators. However, the Court finds a recent Fourth Circuit decision instructive. In *United States v. Jalaram, Inc.*, the defendant was convicted of conspiracy to violate the Mann Act, conspiracy to induce an individual to travel in interstate commerce to engage in prostitution, conspiracy to commit money laundering, and money laundering. *See* 599 F.3d at 350. The government sought to enforce the jury's verdict that the conspirators (including Jalaram) were jointly and severally liable for the gross proceeds of the Mann Act conspiracy. *Id.* The district court concluded that the requested forfeiture was grossly disproportional to Jalaram's offense and thus would violate the Excessive Fines Clause. *Id.*

The Fourth Circuit first considered the government's argument that the proposed forfeiture was not subject to the Eighth Amendment. Holding that the Excessive Fines Clause did apply, the court observed that while only in rare cases would a single defendant be able to establish that forfeiture of proceeds violated the Excessive Fines Clause, exempting such forfeitures from the Eighth Amendment's reach could:

> work a grave injustice in cases involving joint and several liability. In such cases, some defendants inevitably disgorge more money than they received from the

> conspiracy, thus forfeiting property that they obtained lawfully in order to satisfy the forfeiture judgment. In a case where a defendant played a truly minor role in a conspiracy that generated vast proceeds, joint and several liability for those proceeds might result in a forfeiture order grossly disproportional to the individual defendant's offense.

*Id.* at 354-55 (footnote omitted). The Fourth Circuit thus recognized that special Eighth Amendment concerns might arise in cases involving joint and several liability among co-conspirators.

The court ultimately determined, however, that the $358,390.22 forfeiture award sought against Jalaram did not constitute an excessive fine. *Id.* at 357. In reaching this conclusion, the court first applied the *Bajakajian* factors, which supported the constitutionality of the forfeiture: the conspiracy had "generated hundreds of thousands of dollars in illicit revenues" and was in operation over a period of several months; the crimes charged were related to other offenses; and the sentencing guidelines for Jalaram's offense provided for a fine of up to $350,000. *Id.* at 356. The court concluded that these factors "indicate[d] that Congress considers crimes like Jalaram's far more serious than the reporting offense in *Bajakajian*, and that Jalaram must clear a significantly higher hurdle to show that the requested forfeiture is grossly disproportional to the gravity of its offense." *Id.*

The court rejected Jalaram's argument that it had received little money from its participation in the conspiracy, finding that the amount of proceeds the company received was not necessarily indicative of the extent of its role in the offense.

> [T]he fact that Jalaram may have received only a small share of the proceeds, in and of itself, does not demonstrate that it played a minor role in the conspiracy. That fact establishes only that Jalaram's participation in the conspiracy was not lucrative; it does not speak to Jalaram's level of culpability.

*Id.* In fact, the court found, Jalaram had been a major player in the organization, "st[anding] at the heart of the conspiracy's day-to-day operations for a six-month period." *Id.* at 357. Based on this extensive involvement and the seriousness of Jalaram's offense as measured by the *Bajakajian* factors, the Fourth Circuit concluded that the requested forfeiture did not violate the Excessive Fines Clause and held that the district court had erred in finding otherwise. *Id.*

Likewise, in the instant case, the *Bajakajian* factors and the evidence of Stivers' level of involvement in the conspiracies indicate that the Court would not run afoul of the Eighth Amendment by holding him jointly and severally liable for the entire forfeiture amount. First, the underlying offenses — conspiracy to violate RICO and conspiracy to commit money laundering — are much more significant crimes than a mere failure to report currency. The second *Bajakajian* factor is also met, as each conspiracy was by definition related to other illegal activities: the members of the RICO enterprise conspired to engage in extortion, bribery, honest-services mail fraud, and obstruction of justice, and the money-laundering conspiracy involved proceeds of bribery and extortion. Third, the money sought in forfeiture consists of the fruits of illegal activity: the funds at issue under Count 12 include salaries received by defendants who maintained their employment by virtue of their association with the criminal enterprise; likewise, the forfeiture sought under Count 13 represents the value of city and county contracts awarded to certain defendants in exchange for their participation in vote-buying. As a member of an established criminal organization, Stivers also falls into the class of persons targeted by the RICO and money-laundering statutes. Moreover, unlike the essentially victimless reporting offense at issue in *Bajakajian*, the harm caused by the conspirators in this case was significant:

there was substantial evidence presented at trial that these conspiracies were at the heart of widespread corruption in Clay County. And there was also evidence connecting the groups to drugs and acts of violence.

Finally, and perhaps most convincing, the maximum statutory penalty for the RICO conspiracy charge is a fine of twice the proceeds obtained from the crime and twenty years in prison; for the money-laundering conspiracy, the statutory maximum is equally severe: a fine of twice the value of the property involved in the transaction and twenty years in prison. *See* 18 U.S.C. §§ 1963(a), 1956(a)(1). In other words, there is no ceiling on the monetary penalty that can be imposed for either offense. Rather, the amount of the fine is limited only by the amount of money involved in the crime. It is apparent, then, that Congress considered these to be very serious offenses, and thus Stivers "must clear a significantly higher hurdle to show that the requested forfeiture is grossly disproportional to the gravity of [his] offense." *Jalaram*, 599 F.3d at 356. Because the evidence shows that he played a major role in the conspiracies, that hurdle is insurmountable.

The government presented ample evidence of Stivers' involvement in the conspiracies. For example, the jury heard audiotapes of Stivers instructing a cooperating witness how to answer questions about other conspiracy members at her impending appearance before a federal grand jury. On another recording, Stivers reassured the cooperating witness that co-conspirators Jones and Freddy Thompson "took care of" fraudulent voter-assistance forms she had signed as an election officer. Moreover, while the evidence regarding Stivers' encounters with Carmen Webb Lewis did not prove attempted extortion, it did show Stivers' connection to the vote-

buying scheme and the related money-laundering conspiracy, in which Vernon Hacker, as a member of the Manchester city council, helped ensure that city contracts went to companies owned by Defendants William Morris and Stanley Bowling in exchange for their participation in vote-buying. Thus, it is clear that Stivers was not a bit player in these criminal organizations. Indeed, as the United States points out, based on the evidence presented at trial, "[i]t is difficult to identify any one among the eight defendants who had more involvement in the mechanics of the enterprise than Stivers." [Record No. 908, p. 5]

Whether Stivers received any personal benefit as a result of his membership in the conspiracies is irrelevant. He is responsible for the reasonably foreseeable proceeds of those conspiracies. *See Corrado*, 227 F.3d at 558. The evidence shows that Stivers was well-aware of the roles played by the various conspiracy members. Thus he could reasonably have foreseen that his co-conspirators would receive salaries or contracts as a result of their association with the conspiracies. The United States' failure to put a dollar amount next to Stivers' name on a visual aid is insignificant, because the government was not required to prove that he received any share of the funds. *See id.* The fact that his participation in the conspiracies was not profitable does not detract from his extensive involvement in them. *See Jalaram*, 599 F.3d at 356. Based on the seriousness of the crimes Stivers committed and his level of participation in the conspiracies, the Court finds that the requested forfeiture is not is not grossly disproportional to the seriousness of his offense and thus will not violate the Excessive Fines Clause of the Eighth Amendment.

### III.    CONCLUSION

The evidence presented at trial does not support Stivers' conviction on Count 4 under either of the theories pursued by the United States.  However, Stivers may properly be held jointly and severally liable for the forfeiture amounts found by the jury on Counts 12 and 13. Accordingly, it is hereby

**ORDERED** as follows:

(1)    Stivers' Motion for Judgment of Acquittal [Record No. 867] is **GRANTED** as to Count 4 (attempted extortion).

(2)    Stivers' motion is **DENIED** as to Counts 12 and 13 (forfeiture).  Upon entry of final judgment of forfeiture, Stivers will be jointly and severally liable for the full forfeiture amount.

This 11th day of June, 2010.



Signed By:
*Danny C. Reeves*
**United States District Judge**